UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
DONTE C. GRANT,

                                Plaintiff,

        - against-                                          **OPINION AND ORDER**
                                                            **12-CV-4729 (SJF)(WDW)**

NEW YORK STATE OFFICE FOR PEOPLE
WITH DEVELOPMENTAL DISABILITIES
and DIANNA THEREZO, in her personal capacity,

                                Defendants.
-------------------------------------------------------------X
FEUERSTEIN, J.

FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★    JUL 3 0 2013    ★

LONG ISLAND OFFICE

        On September 21, 2012, plaintiff Donte C. Grant ("plaintiff") commenced this

employment discrimination action against defendants New York State Office for People with

Developmental Disabilities ("OPWDD") and Dianna Therezo ("Therezo") (collectively,

"defendants") pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §

2000e, *et seq.*, and 42 U.S.C. § 1983 ("Section 1983"), asserting claims based upon gender

discrimination, retaliation and violations of his equal protection rights. Pending before the Court

is defendants' motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure for failure to state a claim for relief. For the reasons set forth below, the motion

is granted.

1

I.      Background[1]

        A.      Factual Background

On February 10, 2011, plaintiff began working for OPWDD as a direct support assistant

trainee working at the Intermediate Care Facility, Centereach Unit. (Compl., ¶¶ 8, 11). Plaintiff

"primarily worked at the Centereach A residence, but occasionally worked at Centereach B and

the Holbrook IRA." (Compl., ¶ 11). His duties "consisted of interacting with the residents,

providing medications, taking residents to and from medical appointments, assisting them with

their activities of daily living such as toileting, showering, and other matters of personal hygiene,

*and maintaining the residence*." (Compl., ¶ 10) (emphasis added). Following a one (1)-year

probationary period, plaintiff would either be hired as a full-time employee or his employment

with OPWDD would be terminated. (Compl., ¶ 9).

Performance evaluations completed for the period from February 10, 2011 through May

10, 2011 ("the first evaluation") and May 11, 2011 through August 11, 2011 ("the second

evaluation") rated the quality and quantity of plaintiff's work, his work habits and interest and his

understanding of OPWDD's policies and procedures as "average." (Compl., Ex. B). The first

evaluation indicates that plaintiff "works well with the consumers," "completes his work,"

"follows directions," "can work independently," "understands the routine," "gets his work done,"

and "is very helpful," but that he "needs to think things through in order to better organize and

---

[1] The following facts are taken from the pleadings and documents attached thereto and do not constitute findings of fact by the Court.

plan tasks" and "is still learning policies and procedures."[2] (Id.) The second evaluation indicates that plaintiff "always completed [his work] in a timely manner," "maintains the environment in a clean and orderly manner," "works independently[,] is always helpful and understands what needs to be done," and "continues to learn policies and procedures," but that he "needs to work closer with the consumers to learn there [sic] specific needs." (Id.) On the second evaluation, Therezo also: (1) commented that plaintiff's "time and attendance is very good. He has a good report [sic] with staff and consumers. He works well and is an asset to the unit;" and (2) recommended that plaintiff continue as a probationary employee. (Id.)

Plaintiff alleges that on October 30, 2011, he volunteered to work an overnight shift at the Holbrook IRA because "the regularly scheduled employees [had been] unable to come in that night" and "every other potential employee option [had been] exhausted." (Compl., ¶¶ 23-24). According to plaintiff, he "was aware that if he worked this overnight shift, as well as his other regularly scheduled shifts, he would be over 40 hours for that week, and therefore entitled to overtime pay," so he "repeatedly" asked Brenda Dawson ("Dawson"), another supervisor for Centereach A, if management would approve him to work that shift. (Compl., ¶ 24). Dawson "reassured him that indeed management had approved him to work the overnight shift." (Id.) Another employee, Kimberly Sermon, also told him that she had personally spoken with Mildred Zawistowski ("Zawistowski"), Therezo's supervisor, who told her that she had approved plaintiff to work the overnight shift. (Id.)

On November 2, 2011, Therezo "issued a write-up to [plaintiff] for accepting the

---

[2] It appears that the evaluations are comprised of two (2) pages, but plaintiff attached only the first page of the first evaluation to his complaint.

overnight shift * * *." (Compl., ¶ 25; Ex. A). Specifically, Therezo charged plaintiff with disregarding a directive, i.e., that plaintiff had been told "that [he] [was] not to accept any voluntary hours because this would put [him] into overtime and [he] [was] not to work overtime unless it was mandated or approved by [herself; Kathryn Maurice ("Maurice"), the Residential Unit Supervisor; or Zawistowski]," yet he accepted the overnight shift without "getting direct authorization from either [Zawistowski] or [Therezo]." (Compl., Ex. A). Plaintiff "formally disagreed with the write-up," (Compl., ¶ 25), indicating, *inter alia*, that he "was told that management knew that [he] was working the overnight * * * and that management was aware [he] would be in overtime." (Compl., Ex. A).

On November 4, 2011, plaintiff "complained to his union representative, Rutha Bush ["Bush"]." (Compl., ¶ 27). According to plaintiff, Bush told him "that he should not complain because he was a probationary employee and there was not much she could do until he became a full time employee," but that "she would contact Yolanda Sahagun, [OPWDD's] Director of Human Resources." (Id.)

Plaintiff alleges that "[s]oon after [he] made complaints regarding his employment conditions he began to receive verbal counseling from Ms. Therezo on a nearly daily basis regarding his work performance, which he had not received before to that extent." (Compl., ¶ 28). Specifically, plaintiff alleges that "[w]ithin the span of three days Ms. Therezo made four complaints to [him] regarding his work performance," some of which pertained to "potentially serious violations of medication distribution to patients," (Compl., ¶ 30), yet she "never saw fit to provide [him] with a formal write-up" and she did not inform the nurse on duty at the residence of his "alleged medication infractions," in violation of OPWDD policy. (Compl., ¶ 31).

4

On November 16, 2011, plaintiff received his third and final evaluation, which indicated "that his work performance had deteriorated and that [his employment] should be terminated." (Compl., ¶ 32; Ex. C). This third evaluation covers the period from August 10, 2011 through November 10, 2011 and rated the quality and quantity of plaintiff's work as "average," but his work habits and interest and understanding of OPWDD's policies and procedures as "unacceptable." (Compl., Ex. C). The third evaluation indicates that plaintiff's "paperwork is done neatly and timely," but that his "performance has deteriorated," his "work habits have been declining," "consumers [sic] needs are not being met," and he "must follow procedures for medication administration and other policies." (Id.) In addition, the third evaluation indicates that plaintiff had received one (1) verbal counseling because "while driving the state van [he] ran a redlight [sic] and received a ticket" and had received one (1) written counseling for failing to "follow a directive." (Id.) The third evaluation recommended that plaintiff's probationary employment be terminated. (Id.)

According to plaintiff, soon after he received the third evaluation, Maurice submitted a letter on his behalf indicating "what a valuable employee he had been" and that he "went above and beyond his required duties." (Compl., ¶ 33; Ex. D). Specifically, Maurice indicated, *inter alia*, that she worked with plaintiff from August 2011 until her reassignment on October 31, 2011; that during the time she supervised plaintiff, "he completed all of his assignments and ensured the consumers in the Centereach Unit were given the best of care, always insuring they attended their clinics, and that their personal plans were followed;" that it was her opinion that plaintiff "went above and beyond what was asked of him;" that plaintiff was "always willing to learn and follow policy and procedure, according to the training he received * * *;" and that

5

plaintiff "would be an asset to any unit * * *, and it would be a great loss to this facility should [he] not be allowed to continue to work for OPWDD * * *." (Compl., Ex. D). In addition, Maurice wrote: "All though [sic] we don't discriminate I must admit [plaintiff] received extra assignments because of his strength and he always completed them without any complaints." (Id.)

Plaintiff alleges that on November 22, 2011, he and Bush attended "what was supposed to be an appeal hearing regarding his termination" conducted by Sahagun, but Sahagun "simply stated that [his] termination was settled and would not change." (Compl., ¶ 35). According to plaintiff, Sahagun asked him to resign, but he refused. (Id.)

Plaintiff alleges that during the entire period of his employment, he was "the only regularly scheduled male employee at the Centereach A location" and that the same was not true for the other locations at which he occasionally worked. (Compl., ¶ 12). Plaintiff also alleges that he was often asked to perform work above and beyond his assigned duties," particularly "any work in the house that required physical strength," such as removing the garbage, restocking supplies and putting away groceries every Wednesday. (Compl., ¶¶ 13-14). According to plaintiff, "[f]emale staff members would laugh and snicker as [he] undertook this physical labor;" would refer to him as "the 'dog' of the unit;" and would "refuse to perform physical aspects of the job knowing that if they left this work undone, [his] supervisor, Dianna Therezo, would require him to do it when he returned to work." (Compl., ¶ 15). Plaintiff alleges that when he asked Therezo "why he was the only employee responsible for physical labor she would tell him 'because you're a man, you're stronger.'" (Compl., ¶ 16).

Plaintiff further alleges that when he and Therezo were the only scheduled employees

6

working at the residence, Therezo would not assist him with caring for the residents or with any of "the other myriad tasks employees were responsible for." (Compl., ¶ 17). According to plaintiff, since Therezo would not assist him, "he often was unable to fully care for the residents * * * particularly on days when [he] had to transport residents to outside appointments." (Compl., ¶ 18).

In addition, plaintiff alleges that Therezo refused to train him, in violation of OPWDD's policy requiring supervisors to train probationary employees. (Compl., ¶ 19). When plaintiff asked Therezo about his training, "she told him not to worry about it." (Id.) According to plaintiff, he did not receive any training until August 23, 2011, over six (6) months after he began working for OPWDD, and he only received it because Maurice instructed Therezo to begin it. (Compl., ¶ 20).

Plaintiff alleges that the training provided by Therezo was "sub-standard," as "[s]he did not take the time or effort that would ordinarily be required to train an individual in particular areas, but rather rushed through the training haphazardly." (Compl., ¶ 21). Plaintiff further alleges that he "did not receive training in all of the areas he was supposed to" because Therezo ceased training him after Maurice left the Centereach unit. (Compl., ¶ 22).


B.     Procedural Background

On November 30, 2011, plaintiff filed a complaint regarding his treatment at OPWDD with the New York State Division of Human Rights ("NYSDHR"). (Compl., ¶ 36). On March 30, 2012, the NYSDHR dismissed the complaint "for administrative convenience." (Compl., ¶ 37). On September 11, 2012, the Equal Employment Opportunity Commission ("EEOC") issued

plaintiff a Right to Sue letter. (Compl., ¶ 38).

On September 21, 2012, plaintiff commenced this employment discrimination action against defendants pursuant to Title VII and Section 1983, alleging gender discrimination (first cause of action against OPWDD), retaliation (second cause of action against OPWDD), and violations of his equal protection rights (third cause of action against Therezo).[3] Specifically, plaintiff alleges: (1) that OPWDD discriminated against him "[b]y requiring [him] to work under more onerous working conditions because he was a man," (Compl., ¶ 42); (2) that OPWDD retaliated against him by terminating his employment "for complaining about a discriminatory environment," (Compl., ¶ 44); and (3) that Therezo violated his equal protection rights "[b]y discriminating against [him] due to his gender," (Compl., ¶ 46). Plaintiff seeks: (1) judgment declaring (a) that OPWDD's actions violated Title VII and (b) that Therezo's actions violated Section 1983; (2) compensatory and punitive damages; and (3) attorney's fees, costs and disbursements.

Defendants now move to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief.

II.    Discussion

A.    Standard of Review

The standard of review on a motion made pursuant to Rule 12(b)(6) of the Federal Rules

---

[3] Plaintiff initially commenced an employment discrimination action against defendants on April 12, 2012, prior to receiving the Right to Sue letter from the EEOC. (Compl., ¶ 39). On July 2, 2012, plaintiff voluntarily dismissed that action without prejudice pursuant to Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure. (Compl., ¶ 40).

of Civil Procedure is that a plaintiff plead sufficient facts "to state a claim for relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). The pleading of specific facts is not required; rather a complaint need only give the defendant "fair notice of what the * * * claim is and the grounds upon which it rests." Erickson v. Pardus, 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting Twombly, 550 U.S. at 555, 127 S.Ct. 1955). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 557, 127 S.Ct. 1955). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. 544, 127 S.Ct. at 1959. The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937.

In deciding a motion pursuant to Rule 12(b)(6), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. See McGarry v. Pallito, 687 F.3d 505, 510 (2d Cir. 2012); Rescuecom Corp. v. Google Inc., 562 F.3d 123, 127 (2d Cir. 2009). However, this tenet "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. 662, 129 S.Ct. at 1949. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 1950; see also Ruston v. Town Board for Town of Skaneateles, 610 F.3d 55,

59 (2d Cir. 2010) ("A court can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." (quotations and citations omitted)). Nonetheless, a plaintiff is not required to plead "specific evidence or extra facts beyond what is needed to make the claim plausible." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120-1 (2d Cir. 2010); see also Matson v. Board of Education of City School District of New York, 631 F.3d 57, 63 (2d Cir. 2011) ("While a complaint need not contain detailed factual allegations, it requires more than an unadorned, the defendant-unlawfully-harmed-me accusation." (internal quotations and citation omitted)).

The Court must limit itself to the facts alleged in the complaint, which are accepted as true; to any documents attached to the complaint as exhibits or incorporated by reference therein; to matters of which judicial notice may be taken; or to documents upon the terms and effect of which the complaint "relies heavily" and which are, thus, rendered "integral" to the complaint. Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002) (citing International Audiotext Network, Inc. v. American Tel. and Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995)).


B.     Gender Discrimination Claim (First Cause of Action)

Defendants contend that plaintiff's complaint fails to state a gender discrimination claim because plaintiff was not qualified for the position, he did not suffer any adverse employment action and his termination was not motivated by discriminatory intent.

In order to establish a prima facie case of employment discrimination, a plaintiff must demonstrate (1) membership in a protected group; (2) that he or she was qualified for the position at issue; (3) that he or she suffered an adverse employment action; and (4) that the adverse

10

employment action occurred "under circumstances giving rise to an inference of discrimination." Reynolds v. Barrett, 685 F.3d 193, 202 (2d Cir. 2012) (alterations, quotations and citation omitted); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). "The prima facie case under McDonnell Douglas, however, is an evidentiary standard, not a pleading requirement." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002). "[T]he Federal Rules do not contain a heightened pleading standard for employment discrimination suits." Id. at 515, 122 S. Ct. 992. Accordingly, "an employment discrimination plaintiff need not plead a prima facie case of discrimination * * *." Id.; see also Boykin v. KeyCorp, 521 F.3d 202, 212 (2d Cir. 2008) ("Swierkiewicz does not require [the plaintiff] to plead facts sufficient to establish a prima facie disparate treatment claim.") Rather, the complaint "need only satisfy Rule 8(a)'s standard of a 'short and plain statement of the claim showing that [the plaintiff] is entitled to relief.'" Boykin, 521 F.3d at 213 (quoting Fed. R. Civ. P. 8(a)(2)); see also Hamzik v. Office for People with Developmental Disabilities, 859 F. Supp. 2d 265, 279 (N.D.N.Y. 2012). Thus, "to overcome a Rule 12(b)(6) motion to dismiss in an employment discrimination case, a complaint must give fair notice of the basis of plaintiff's claims and the claims must be facially plausible." Mabry v. Neighborhood Defender Service, 769 F. Supp. 2d 381, 390 (S.D.N.Y. 2011). A complaint that alleges that the plaintiff has suffered an adverse employment action on account of a protected characteristic, and that details the events leading to the adverse employment action, provides relevant dates, and includes the corresponding characteristics of at least some of the relevant individuals involved with the adverse employment action, are sufficient to state a discrimination claim. See, e.g. Swierkiewicz, 534 U.S. at 514, 122 S. Ct. 992; Boykin, 521 F.3d at 214-15. In short, allegations

11

that "indicate the possibility of discrimination * * * present a plausible claim of disparate treatment." Boykin, 521 F.3d at 215.

Nonetheless, "[t]he *sine qua non* of a gender-based discriminatory action claim under Title VII is that 'the discrimination must be *because of* sex.'" Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007) (quoting Leibovitz v. New York City Transit Authority, 252 F.3d 179, 189 (2d Cir. 2001)). "[M]istreatment at work . . . is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic." Id. (quoting Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001)); see also Kouakou v. Fideliscare New York, — F. Supp. 2d —, 2012 WL 6955673, at * 3 (S.D.N.Y. Dec. 17, 2012) (accord). "Moreover, to be actionable under Title VII, the action that is alleged to be gender-based must rise to the level of an adverse employment action." Patane, 508 F.3d at 112 (alterations, quotations and citation omitted). "[A]n action must cause a materially adverse change in the terms and conditions of employment, and not just mere inconvenience, in order to qualify as 'adverse.'" Patane, 508 F.3d at 112 (quotations and citation omitted). A complaint that fails "to plead any facts that would create an inference that any adverse action taken by a[] defendant was based upon [the plaintiff's] gender" fails to state a discrimination claim under Title VII, id. (alterations, quotations and citation omitted); see also Kouakou, — F. Supp. 2d —, 2012 WL 6955673, at * 4 (accord); Hamzik, 859 F. Supp. 2d at 279 (holding that the plaintiff failed to state a Title VII sex discrimination claims "because the complaint [was] devoid of any allegations from which it [could] be reasonably inferred that the defendants' action was taken because of his sex"), because it fails "to allege even the basic elements of a discriminatory action claim." Patane, 508 F.3d at 112, n. 3; see also Hedges v. Town of Madison, 456 Fed. Appx. 22, 24 (2d Cir. Jan. 13, 2012)

12

(summary order) ("Assuming the most minimal of notice pleading standards, a plaintiff is still required to give fair notice to the defendants of the factual bases for his claims."); Mabry, 769 F. Supp. 2d at 392 (holding that although a plaintiff is not required to plead a prima facie case of employment discrimination, "[a] complaint must nevertheless allege the essential elements of an employment discrimination claim– that plaintiff suffered discrimination on the basis of protected status.") Thus, for example, if a plaintiff fails to allege: (1) that he or she was subject to any specific gender-based adverse employment action by a defendant; (2) any facts from which a gender-based motivation for a defendant's action might be inferred; or (3) that any employee of the opposite gender was given preferential treatment when compared to plaintiff, the complaint is insufficient to state a gender discrimination claim under Title VII. See, e.g. Patane, 508 F.3d at 112; Mabry, 769 F. Supp. 2d at 392. Moreover, a failure to allege "a sufficient adverse employment action" justifies dismissal of an employment discrimination claim on the pleadings. See, e.g. Hamzik, 859 F. Supp. 2d at 279; Mabry, 769 F. Supp. 2d at 392.

1.     Adverse Employment Action

The only adverse employment action that plaintiff alleges was discriminatory was his assignment to more onerous work assignments.[4] (Compl., ¶ 42).

---

[4] Plaintiff does not allege, and there are no factual allegations in the complaint from which it may plausibly be inferred, that Therezo's "write-up;" lack of, or sub-standard, training of plaintiff; refusal to assist plaintiff with tasks; or negative evaluation of plaintiff were based at all upon plaintiff's gender. Indeed, plaintiff does not allege that any similarly situated female probationary employee disobeyed a directive but was not given a "write-up" by Therezo; received any better training or assistance from Therezo; or received a better performance evaluation and/or was not terminated after having been counseled both verbally and in writing for engaging in conduct similar to plaintiff's, i.e., receiving a traffic infraction in a state vehicle and

13

"A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment . . . . An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012) (quoting Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006)); see also Mathirampuzha v. Potter, 548 F.3d 70, 78 (2d Cir. 2008); Galabya v. New York City Board of Education, 202 F.3d 636, 640 (2d Cir. 2000). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Galabya, 202 F.3d at 640 (quotations and citation omitted).

"[A]llegations of * * * unfair work assignments, without more, do not amount to 'adverse employment actions' because they are not materially adverse changes in the terms or conditions of [the plaintiff's] employment." Hubbard v. Port Authority of New York and New Jersey, No. 05 Civ. 4396, 2008 WL 464694, at * 11 (S.D.N.Y. Feb. 20, 2008); see also Figueroa v. New York City Health and Hospitals Corp., No. 03 Civ. 9589, 2007 WL 2274253, at * 4 (S.D.N.Y. Aug. 7, 2007) ("[S]imply being assigned undesirable work duties * * * [is] insufficient to establish adverse employment action, since [such assignments] do not have a material impact on the terms and conditions of plaintiff's employment.") "[G]enerally giving preferential treatment with respect to work assignments to others outside of [the plaintiff's] protected class[]" does not qualify as an adverse employment action where the plaintiff did not otherwise suffer a

---

disobeying a directive, respectively, and failing to follow OPWDD procedures and policies, including medication administrative procedures.

14

"demotion, material loss of benefits, * * * significantly diminished material responsibilities,"

Costello v. New York State Nurses Association, 783 F. Supp. 2d 656, 677-78 (S.D.N.Y. 2011),

or other "materially adverse change" in the terms and conditions of his or her employment.

Hubbard, 2008 WL 464694, at * 12; see also McCowan v. HSBC Bank USA, N.A., 689 F. Supp.

2d 390, 408 n. 8 (E.D.N.Y. 2010) ("[In] the absence of any evidence that * * * job assignments

had any negative results, such as a denial of pay increase or bonus or a suspension, such

[assignments] cannot constitute [an] adverse employment action[] as a matter of law.")  Since

plaintiff does not allege any negative ramifications or change in employment status as a result of

his assignments to the more physical tasks in maintaining the residence, "that negative change

which signifies adversity is absent." Hubbard, 2008 WL 464694, at * 12.

Moreover, plaintiff does not allege that any of the work assignments to which he was

assigned exceeded the scope of his job duties.  "Where assignments fall within the duties of a

plaintiff's position, receiving unfavorable * * * work assignments does not rise to the level of an

adverse employment action." Williams v. New York City Housing Authority, No. 03 Civ. 7764,

2008 WL 2695139, at * 3 (S.D.N.Y. June 29, 2008), aff'd, 361 Fed. Appx. 220 (2d Cir. Jan. 19,

2010); see also Billingslea v. Ford Motor Co., Inc., No. 06-cv-0556, 2010 WL 4861500, at * 7

(W.D.N.Y. Nov. 30, 2010) ("A plaintiff's assigned task, however undesirable it may be, does not

constitute an adverse employment action under Title VII if it falls within his or her job

responsibilities."); Aspilaire v. Wyeth Pharmaceuticals, Inc., 612 F. Supp. 2d 289, 305 (S.D.N.Y.

2009) (holding that assignments to tasks within the scope of an employee's job do not constitute

adverse employment actions since such assignments are "consistent with the terms and

conditions of [the] plaintiff's employment."); Hubbard, 2008 WL 464694, at * 12 (holding that

15

plaintiffs "cannot complain of work properly assigned to them.") Since all of the tasks to which

plaintiff was assigned involved maintaining the residence and are, thus, precisely those that direct

support assistant trainees for the OPWDD are expected to perform, and plaintiff does not claim

that such work assignments negatively affected his pay, hours or position, there are no allegations

from which it may plausibly be inferred that plaintiff suffered an adverse employment action, an

essential element of a Title VII gender discrimination claim. See, e.g. Chandler v. AMR

American Eagle Airline, 251 F. Supp. 2d 1173, 1184 (E.D.N.Y. 2003) (holding that the

plaintiff's claim was insufficient to establish an adverse employment action where he failed to

allege "that he was ever assigned tasks that exceeded his general job duties or that any

assignment affected his pay, hours, or position.") Accordingly, the branch of defendants' motion

seeking dismissal of plaintiff's gender discrimination claim (first cause of action) is granted and

that claim is dismissed in its entirety with prejudice for failure to state a claim for relief.[5]


C.     Retaliation Claim (Second Cause of Action)

The only adverse action that plaintiff claims is retaliatory is the termination of his

employment. (Compl., ¶ 44).

"To make out a *prima facie* case of retaliation, a plaintiff must demonstrate that '(1) she

engaged in protected activity; (2) the employer was aware of that activity; (3) the employee

suffered a materially adverse action; and (4) there was a causal connection between the protected

activity and that adverse action.'" Kelly v. Howard I. Shapiro & Associates Consulting

---

[5] In light of this determination, it is unnecessary to consider defendants' remaining contentions seeking dismissal of plaintiff's gender discrimination claim.

Engineers, P.C., 716 F.3d 10, 14 (2d Cir. 2013) (quoting Lore v. City of Syracuse, 670 F.3d 127,

157 (2d Cir. 2012); see also Patane, 508 F.3d at 115.


1.    Protected Activity Known to Defendant

As to the first element of a *prima facie* claim of retaliation, "an employee need not

establish that the conduct she opposed was in fact a violation of Title VII, but rather, only that

she had a good faith, reasonable belief that the underlying employment practice was unlawful"

under Title VII. Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d Cir. 1996)

(alterations, quotations and citation omitted); see also Kelly, 716 F.3d at 14; Kessler v.

Westchester County Department of Social Services, 461 F.3d 199, 210 (2d Cir. 2006).  "As to

the second element of the *prima facie* case, implicit in the requirement that the employer have

been aware of the protected activity is the requirement that it understood, or could reasonably

have understood, that the plaintiff's complaint was directed at conduct prohibited by Title VII."

Kelly, 716 F.3d at 15 (quoting Galdieri-Ambrosini v. National Realty & Development Corp., 136

F.3d 276, 292 (2d Cir. 1998)); see also Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d

98, 107-08 (2d Cir. 2011), cert. denied, 132 S. Ct. 1744, 182 L. Ed. 2d 530 (2012).  "Although

particular words such as 'discrimination' are certainly not required to put an employer on notice

of a protected complaint, neither are they sufficient to do so if nothing in the substance of the

complaint suggests that the complained-of activity is, in fact, unlawfully discriminatory." Kelly,

716 F.3d at 17.

Plaintiff does not allege, and there are no factual allegations in the complaint from which

it may plausibly be inferred, that his complaints to Bush involved conduct prohibited by Title

VII, i.e., that he complained to Bush that Therezo had given him a "write-up," or that he had

been subjected to any other adverse employment action, because he is male.[6] All plaintiff alleges

is that on November 4, 2011, two (2) days after Therezo had issued him a "write-up," he

"complained to his union representative, Rutha Bush," (Compl., ¶ 27), and that his complaints

pertained to "his employment conditions," (Compl., ¶ 28). Plaintiff does not indicate the specific

employment conditions about which he complained, nor that those conditions related in any way

to his gender. Thus, there are no factual allegations in the complaint from which it may plausibly

be inferred either that plaintiff himself possessed a good-faith belief that he was complaining to

Bush of conduct prohibited by Title VII or that defendants could have understood his complaints

to Bush in that way. See, e.g. Kelly, 716 F.3d at 16 (affirming dismissal of retaliation claim

where there was "no indication either that [the plaintiff] herself possessed a good-faith belief that

she was complaining of conduct prohibited by Title VII or that her employers could have

understood her complaints in th[at] way."); Rojas, 660 F.3d at 108 (affirming dismissal of the

plaintiff's retaliation claims where the complaints the plaintiff made were generalized and,

therefore, the defendant "could not reasonably have understood that [the plaintiff] was

complaining of 'conduct prohibited by Title VII.'")[7]

---

[6] Plaintiff's written disagreement with Therezo's "write-up" does not constitute protected activity because his written disagreement did not indicate in any way that the "write-up" had anything to do with his gender. (Compl., Ex. A).

[7] Defendants' reliance on Townsend v. Benjamin Enterprises, Inc., 679 F.3d 41 (2d Cir. 2012), for the proposition that "Title VII's anti-retaliation provision does not protect participation in an internal employer investigation not associated with any formal [EEOC] Charge," (Def. Mem. at 13), is misplaced. "Section 704(a) of Title VII contains both an opposition clause and a participation clause, making it unlawful for an employer to retaliate against an individual 'because he has opposed any practice made an unlawful employment practice by this subchapter,

Moreover, although "[n]othing more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity," Summa v. Hofstra University, 708 F.3d 115, 125-26 (2d Cir. 2013) (quotations and citation omitted); see also Papelino v. Albany College of Pharmacy of Union University, 633 F.3d 81, 92 (2d Cir. 2011) ("Even if the agents who carried out the adverse action did not know about the plaintiff's protected activity, the 'knowledge' requirement is met if the legal entity was on notice."), plaintiff does not allege, and there are no factual allegations in the complaint from which it may plausibly be inferred, that OPWDD had any knowledge that plaintiff had engaged in a protected activity prior to his termination.  Plaintiff alleges only that he complained to Bush, his union representative, not an employee or agent of the OPWDD, and that Bush told him she "would contact" OPWDD's director of human resources.  (Compl. ¶ 27).  Absent any allegation that Bush actually contacted anyone at the OPWDD, or that plaintiff made any complaints directly to someone at the OPWDD, there is no basis upon which to find that the OPWDD had any knowledge that plaintiff had engaged in a protected activity prior to his termination.

Thus, the first protected activity of which defendants presumably had knowledge is plaintiff's filing of a complaint against the OPWDD with the NYSDHR on November 30, 2011.

2.    Causation

"[A] plaintiff must plead a causal connection either (1) directly, by alleging facts of a

---

or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" Id. at 48 (quoting 42 U.S.C. § 2000e-3(a)).  Townsend's holding is inapplicable to claims under the opposition clause, which undoubtedly encompasses informal complaints of discrimination.

retaliatory animus directed by a defendant against a plaintiff, or (2) indirectly, by showing that 'the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct.'" Kouakou, — F. Supp. 2d —, 2012 WL 6955673, at * 7 (quoting Gordon v. New York City Board of Education, 232 F.3d 111, 117 (2d Cir. 2000)); see also Summa, 708 F.3d at 127-28 ("[T]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." (quotations and citation omitted)). Plaintiff does not allege any facts from which it may plausibly be inferred that OPWDD had any retaliatory animus toward him or that OPWDD treated similarly situated employees to plaintiff differently than plaintiff with respect to his termination. Since the termination of plaintiff's probationary employment was recommended in the third evaluation dated November 16, 2011, and "was settled and would not change" as of November 22, 2011, (Compl., ¶ 35), prior to plaintiff's filing of a complaint with the NYSDHR on November 30, 2011, plaintiff cannot establish a causal connection between any protected activity and the termination of his employment. See, e.g. Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."); see also Adams v. City of New York, 837 F. Supp. 2d 108, 123 (E.D.N.Y. 2011) (holding that adverse actions that occur prior to any protected activity "cannot be retaliatory as a matter of law and logic.") Accordingly, the branch of defendants' motion seeking dismissal of plaintiff's Title VII retaliation claim (second cause of action) is granted and plaintiff's Title VII retaliation claim is dismissed in its entirety with

prejudice for failure to state a claim for relief.

D.    Section 1983 Claim (Third Cause of Action)

To state a claim under Section 1983, a plaintiff must allege (1) that the challenged

conduct was "committed by a person acting under color of state law," and (2) that such conduct

"deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws

of the United States." Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010) (quoting Pitchell v.

Callan, 13 F.3d 545, 547 (2d Cir. 1994)); see also Rehberg v. Paulk, 132 S. Ct. 1497, 1501-02,

182 L. Ed. 2d 593 (2012).  For purposes of this motion, it is undisputed that Therezo was acting

under color of state law in all relevant respects.  Plaintiff alleges that "[b]y discriminating against

[him] due to his gender * * * Therezo[] has violated the equal protection clause of the Fourteenth

Amendment to United States Constitution."  (Compl., ¶ 46).[8]

To establish a *prima facie* equal protection claim, a plaintiff must demonstrate (1)

"adverse treatment of individuals compared with other similarly situated individuals and [2] that

such selective treatment was based on impermissible considerations such as race, religion, intent

---

[8] Plaintiff does not base his equal protection claim upon any retaliatory conduct by
Therezo and it is unclear whether he could even do so.  Compare Bernheim v. Litt, 79 F.3d 318,
323 (2d Cir. 1996) ("[N]o court * * * has recognized a claim under the equal protection clause
for retaliation following complaints of racial discrimination") with Hicks v. Baines, 593 F.3d
159, 171 (2d Cir. 2010) (holding that "retaliation[] on the basis of [the plaintiffs'] participating in
discrimination investigations and proceedings * * * obviously constitutes an 'impermissible'
reason to treat an employee differently" and, thus, violates the equal protection clause).
Nonetheless, it is unnecessary to resolve this issue since, *inter alia*, any equal protection claim
based upon retaliation would fail for substantially the same reasons plaintiff's Title VII
retaliation claim fails.  See Hicks, 593 F.3d at 164 (holding that the plaintiffs' Section 1983
retaliation claims, *inter alia*, "are analyzed pursuant to Title VII principles.")

to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Miner v. Clinton County, New York, 541 F.3d 464, 474 (2d Cir. 2008) (alterations, quotations and citation omitted); see also Harlen Associates v. Incorporated Village of Mineola, 273 F.3d 494, 499 (2d Cir. 2001).

"Once action under color of state law is established, the analysis for Section 1983 Equal Protection claims [based upon employment discrimination] is similar to that used for employment discrimination claims brought under Title VII, the difference being that a Section 1983 claim, unlike a Title VII claim, can be brought against individuals." Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006); see also Patterson v. County of Oneida, N.Y., 375 F.3d 206, 225 (2d Cir. 2004) (holding that with "several significant differences" not applicable here, "[m]ost of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of * * * the Equal Protection Clause.") Accordingly, plaintiff's Section 1983 equal protection claim against Therezo fails for substantially the same reasons that his Title VII discrimination claim fails. See, e.g. Mills v. Southern Connecticut State University, No. 11-3688-cv, 2013 WL 2157955, at * 3 (2d Cir. May 21, 2013) (summary order) ("Because the analysis for Section 1983 claims based on equal protection is similar to that used for employment discrimination claims brought under Title VII * * *, [the plaintiff's] equal protection claim fails for substantially the same reason as her Title VII claim.") Accordingly, the branch of defendants' motion seeking dismissal of plaintiff's Section 1983 equal protection claim (third cause of action) is granted and plaintiff's Section 1983 equal protection claim is dismissed in its entirety with prejudice for failure to state a claim for relief.

III.     Conclusion

For the reasons stated herein, defendants' motion to dismiss the complaint pursuant to

Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted and the complaint is dismissed

in its entirety with prejudice for failure to state a claim for relief. The Clerk of the Court is

directed to enter judgment in favor of defendants and close this case.


SO ORDERED.

s/ Sandra J. Feuerstein

_____
SANDRA J. FEUERSTEIN
United States District Judge

Dated:  July 30, 2013
        Central Islip, N.Y.